Gregory L. Curtner (GC 5395)
Susan I. Robbins (SR 5759)
Kimberly K. Kefalas
MILLER, CANFIELD, PADDOCK & STONE, P.L.L.C.
1450 Broadway, 41st Floor
New York, NY 10018
Telephone: (212) 704-4400

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**JUDGE RAKOFF**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANTIDOTE INTERNATIONAL FILMS, INC. a
New York corporation,

Plaintiff;

**06  CV  6114**

Civil Action No.

vs.

BLOOMSBURY PUBLISHING, PLC, a
corporation, UNDERDOGS, INC., a
corporation, "J. T. LEROY," a fictitious
individual and/or pseudonym whose identity is
unknown, LAURA ALBERT, an individual,
and JUDI FARKAS, an individual,

Defendants.

**Jury Trial Demanded**



AUG 1 1 2006

U.S.D.C. S.D. N.Y.
CASHIERS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT

Plaintiff, by and through its attorneys, alleges upon knowledge with respect

to its own acts, and upon information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Antidote International Films, Inc. ("Antidote"), brings this action
in order to obtain relief from and recovery for harms inflicted upon its interests by
Defendants Laura Albert, Underdogs, Inc., Bloomsbury Publishing, PLC, Judi Farkas,

AALIB:473732.1\124124-00002

and an unknown individual sometimes known as "J. T. Leroy" who may be a pseudonym or may be fictitious.

2.      In August, 2003, Plaintiff Antidote entered into a contract with Defendants Underdogs, Inc. and J. T. Leroy, a copy of which is attached as Exhibit A.  Antidote purchased an option to develop J. T. Leroy's novel, *Sarah*, into a movie.  Antidote was motivated by and relied upon Defendants Underdogs, J. T. Leroy, Laura Albert's, Judi Farkas', and Bloomsbury's consistent and continuing assertions and representations about J. T. Leroy's rising literary star, his celebrity, his tawdry, tragic and edgy personal history and the autobiographical nature of all of J. T. Leroy's writing, including *Sarah*, in deciding to option the novel.  These representations regarding J. T. Leroy's identity and biography appeared continuously—and in fact still appear—in Defendants' press releases, websites, advertisements, publicity, interviews and reviews.

3.      Defendants' representations regarding J. T. Leroy's identity and biography, however, along with the assertion that *Sarah* was semi-autobiographical, were lies.  J. T. Leroy was exposed in late 2005 as a fraud; Defendant Laura Albert wrote J. T. Leroy's books, faked his biography, faked his persona, and hired her common-law husband's half-sister Savannah to portray the androgynous young writer when it was necessary for J. T. Leroy to appear in public.

4.      Laura Albert's fraud was exposed in late 2005 and early 2006 in publications such as New York Magazine, The New York Times, The San Francisco Chronicle, and Salon, and those articles were followed up with many others.  Still, however, continuing to the date of this Complaint, Defendants Underdogs, Bloomsbury,

and Albert, along with the fictional "J. T. Leroy" persona, continue to publicize, advertise, and benefit from the false representations that J. T. Leroy wrote *Sarah*, that J. T. Leroy exists, and that *Sarah* is semi-autobiographical in nature.  Defendant Albert continues to assert that J. T. Leroy exists and continues to operate J. T. Leroy's website and online diary.  Defendant Underdogs refuses to recognize the breaches of contract its fraud and misrepresentations have caused with regard to the option contract for *Sarah*. Bloomsbury has failed to correct its false application for federal copyright for *Sarah*, which omits the information that J. T. Leroy is a pseudonym, still advertises the works of J. T. Leroy on its corporate website as being based on "Leroy's" real-life experiences, and continues to publish and distribute the work throughout the United States with false biographical representations.  The fraud has been exposed worldwide, and yet Defendants continue to perpetrate it.

5.      Defendants' past and continued misrepresentations regarding the identity of "J. T. Leroy" have and continue to cause injury to Antidote.  As a direct and proximate result of Defendants' knowing and deliberate misrepresentations, Antidote was induced to enter into a contract it would not otherwise have executed.  Antidote paid for the option on *Sarah* for three years and invested significant resources, monetary and otherwise, in attempting to develop a film that now cannot be made.  The line of title to *Sarah*'s film rights is incomplete and unclear.  The misrepresentations by Underdogs, "J. T. Leroy" and his alter-ego, Laura Albert, constitute breaches of the option contract itself, and Underdogs' recent refusal to abide by the terms of the contract through its manager, Judi Farkas, exacerbates that breach.  Bloomsbury's continued false advertising and false

designation of origin threaten to minimize the value of and cause consumer confusion over any film Antidote could eventually make based on *Sarah*. This lawsuit seeks recompense for these harms and threatened harms, and injunctive relief against Defendants' continuing fraud and misrepresentations.

## **PARTIES**

6.     Antidote International Films, a New York City based independent film production company incorporated under the laws of the State of New York, was founded in 2000 by producer Jeffrey Levy-Hinte.  In 2001, Levy-Hinte was joined by producer Mary Jane Skalski.   Since Antidote's inception, either Levy-Hinte or Skalski has produced *Thirteen*, directed by Catherine Hardwicke; *Laurel Canyon*, directed by Lisa Cholodenko; *The Station Agent*, directed by Tom McCarthy; *The Jimmy Show*, directed by Frank Whaley; *Wendigo*, directed by Larry Fessenden; *Limon*, a documentary directed by Malachi Roth; and Gregg Araki's *Mysterious Skin*.

7.     Bloomsbury Publishing, PLC ("Bloomsbury"), is a London-based publishing company incorporated in the United Kingdom that does business worldwide, including in the United States generally and in New York City.

8.     Upon information and belief, Plaintiff alleges that Underdogs, Inc. is a Nevada corporation created to handle "J. T. Leroy's" business interests on behalf of "J. T. Leroy" and/or Laura Albert.  Upon information and belief, Plaintiff alleges that Carolyn Albert, Laura Albert's mother, serves as President and Secretary of Underdogs and operates Underdogs for Laura Albert's benefit.

9.      "J. T. Leroy" is an individual whose actual identity is currently unknown to Plaintiff.  "J. T. Leroy" is the individual who claims and is claimed to have authored several books and articles, including without limitation the novel *Sarah*.   "J. T. Leroy," or someone signing on his behalf, executed a contract with Plaintiff Antidote for an option to develop a film based upon the novel *Sarah*.  Upon information and belief, Plaintiff alleges that the person known to the world as "J. T. Leroy" does not exist.

10.      Laura Albert is an individual.   Upon information and belief, Plaintiff alleges that Ms. Albert resides in or near San Francisco, California.  Upon information and belief, Plaintiff alleges that Ms. Albert is the person who actually wrote the novel *Sarah* and who created the fictional persona "J. T. Leroy."  Upon information and belief, Plaintiff alleges that Ms. Albert operates and/or creates content for the website www.jtleroy.com and is the sole or part owner of Defendant Underdogs Inc., the Nevada corporation set up to handle business on behalf of the likely fictional "J. T. Leroy."

11.      Judi Farkas is an individual operating as Judi Farkas Management, 116 N. Mansfield Avenue, Los Angeles, California 90036 who has and continues to act as the "Manager" to Underdogs, J. T. Leroy, and Albert.


## JURISDICTION AND VENUE

12.      The claims set forth in Counts I and II arise and are brought under §§43(a)(1)(A) and (B) of the Lanham Act, 15 U.S.C. 1125(a)(1)(A) and (B) (2006).

13.      The claims set forth in Counts III-VII of this Complaint arise and are brought under the laws of the State of New York.

14.    Jurisdiction and venue in this Court are proper by law and contract.

15.    This Court has subject matter jurisdiction over this action:

(a)    pursuant to 28 U.S.C. §1331, because the case involves a federal question;

(b)    pursuant to 28 U.S.C. §1333, because there is complete diversity of citizenship between Plaintiff and each defendant, and damages in this action exceed $75,000.00;

(c)    pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §1367, because the federal and state law claims asserted herein are derived from a common nucleus of operative facts.

16.    This Court has personal jurisdiction over each defendant under Federal Rule of Civil Procedure 4(k)(1)(A) and New York's long-arm statute, N.Y. C.P.L.R. §302. Each defendant transacts business, can be found, and has committed torts causing adverse effects in the State of New York and this Judicial District.

(a)    Bloomsbury Publishing transacts significant business in the State of New York. It publishes, publicizes, advertises and sells books in the State of New York, contracts with authors and distributors in the State of New York, and has significant contacts in New York. Antidote's claims against Bloomsbury arise directly from its business activities within the State and this Judicial District.

(b)    Additionally, Bloomsbury engaged in fraudulent behaviors both inside and outside the State of New York that (a) form the basis of the claims against Bloomsbury pled in this Complaint, and (b) caused injury to Plaintiff Antidote in New

York.  Bloomsbury expected or should reasonably have expected its fraud to have consequences in New York, Bloomsbury's fraud did have consequences in New York, and Bloomsbury derives substantial revenue in both interstate and international commerce.

(c)    Underdogs, Inc. transacted significant business in the State of New York.  Plaintiff Antidote's fraud, contract, and equitable claims against Underdogs are based in large part on Underdogs contracting with Antidote in New York for the option contract at issue in this lawsuit.  Exhibit A.  Underdogs has significant business contact in the State related to its ownership, management, publicity, advertisement and contracting regarding business dealings on behalf of "J. T. Leroy".  Antidote's claims against Underdogs arise directly from the business Underdogs conducts in this Judicial District.

(d)    Additionally, Underdogs engaged in fraudulent behaviors both inside and outside the State of New York that (a) form the basis of the claims against Underdogs pled in this Complaint, and (b) caused injury to Plaintiff Antidote in New York.  Underdogs expected or should reasonably have expected its fraud to have consequences in New York, Underdogs' fraud did have consequences in New York, and Underdogs derives substantial revenue in interstate commerce, including without limitation the revenue it derived as a direct result of its fraud within this Judicial District.

(e)    "J. T. Leroy" transacts significant business in the State of New York.  J. T. Leroy's editors do business in this District, J. T. Leroy's novels are published in New York, and he has significant contacts in this District.  Antidote's claims against J. T. Leroy arise directly from his business activities within this District.   J. T. Leroy

7

deliberately advertised, publicized and transacted business in the State of New York, including without limitation the option contract with Plaintiff Antidote at issue in this lawsuit.

(f)     Additionally, "J. T. Leroy" engaged in fraudulent behaviors both inside and outside the State of New York that (a) form the basis of the claims against J. T. Leroy pled in this Complaint, and (b) caused injury to Plaintiff Antidote in New York.  J. T. Leroy expected or should reasonably have expected its fraud to have consequences in New York, J. T. Leroy's fraud did have consequences in New York, and J. T. Leroy derived and continues to derive substantial revenue in interstate commerce, including without limitation the revenue it derived as a direct result of its fraud within this District.

(g)     Laura Albert, who is, upon information and belief, the alter-ego and creator of the "J. T. Leroy" persona, transacts significant business in the State of New York.  Laura Albert and her editors do business in New York, Albert's novels, published under the "J. T. Leroy" persona, are published in New York, and Albert has significant contacts in New York.  Antidote's claims against Albert arise directly from her business activities within this District.  Albert deliberately advertised, publicized and transacted business in the State of New York, including without limitation the option contract with Plaintiff Antidote at issue in this lawsuit.

(h)     Additionally, Laura Albert engaged in fraudulent behaviors both inside and outside the State of New York that (a) form the basis of the claims against Albert pled in this Complaint, and (b) caused injury to Plaintiff Antidote in New York.  Albert expected or should reasonably have expected its fraud to have consequences in

New York, Albert's fraud did have consequences in New York, and Albert derived and continues to derive substantial revenue in interstate commerce, including without limitation the revenue it derived as a direct result of its fraud within this District.

17.     Venue in this Court is proper under 28 U.S.C. §1391(b), because each defendant, by and through business activities in the Southern District of New York, resides, is found, transacts, and/or conducts business in this judicial district, and the unlawful activities complained of herein have been and are being carried out, in whole or in part, in this Judicial District.

18.     Defendants Underdogs, Inc., "J. T. Leroy," and Laura Albert (as J. T. Leroy's alter-ego) have consented to venue and choice of law by contract.  Section 26 of the option contract to develop a film based on *Sarah* (Exhibit A) provides as follows:

> Choice of Law.     The laws of the State of New York applicable to contracts negotiated, executed and wholly performed within said State shall apply to this Agreement. Venue for any dispute hereunder shall be New York County, NY, and the parties irrevocably agree to submit to the jurisdiction of any court, local, state or federal, located therein.

## FACTUAL ALLEGATIONS

### THE HOOK:

### J. T. LEROY—TALENTED, ANGUISHED ARTIST, ANDROGYNOUS INGÉNUE, AND RECLUSE

19.     Defendant Bloomsbury published the novel *Sarah*, reportedly authored by first-time novelist "J. T. Leroy," in or about April 2000.

9

20.     *Sarah* is a story about a 12-year-old, androgynous prostitute who goes by the nickname Cherry Vanilla.  In the book, characterized as a "lurid tale, told in teenage slang," Cherry competes with his mother, the Sarah of the title, for tricks at Southern truck stops.

21.     Leroy's personal history was highly publicized from the start of his writing career.  Leroy himself, his various editors and publishers, and eventually Bloomsbury consistently hawked the story of Leroy's ascent to semi-celebrity status.

22.     According to Leroy's personal history, which became public over a series of reviews and articles and was publicized by Bloomsbury and the press, *Sarah* was a semi-autobiographical novel.  Cherry Vanilla's life was the life Leroy himself had led.  J. T. told reporters that everything he wrote was autobiography.

23.     Both Leroy and Bloomsbury relied upon Leroy's fascinating personal history to sell *Sarah*.  Bloomsbury's press releases, website, book blurbs, and other advertising and publicity all rely on J. T. Leroy's personality, biography, and "authentic voice" in order to sell Leroy's novels.

24.     Leroy's life-story, along with his and Bloomsbury's claims that *Sarah* was semi-autobiographical, lent a substantial and significant aura of authenticity to the story told in *Sarah*.  The idea that this wild, outlandish story—a glimpse into the seedy, tawdry, frequently garish and often touching world of truck-stop prostitution—was at least in part based on J. T.'s actual experiences deepened the value and meaning of the story to its readers.  The imprimatur of authenticity lent by J. T.'s drawing on his own personal experiences directly influenced the novel's readers' experience of the story.

25.     Bloomsbury published Leroy's second book, a collection of stories titled *The Heart is Deceitful Above All Things*, in 2001.  Like *Sarah*, the book was purportedly semi-autobiographical.  The same characters from *Sarah* are featured.  The stories recount how Cherry Vanilla is originally kidnapped from foster parents by his mother, Sarah, and dragged both across the country and into a world of truck-stop prostitution and drugs.  *The Heart is Deceitful Above All Things* was developed into a film directed by Asia Argento, which was released in 2004.

26.     Leroy was purportedly born in West Virginia in 1980, and spent time living on the streets of San Francisco and turning tricks for a living.  The "mythology" of Leroy's history holds that a therapist in San Francisco encouraged Leroy to begin writing his life experiences into narrative as a form of connecting one therapy session to another.  The writing caught his doctor's attention, the doctor introduced J. T. Leroy to some writers and publishers, including Karen Rinaldi of Bloomsbury, and J. T. Leroy's career was launched.

27.     In addition to his novels, J. T. Leroy was (and apparently continues to be) a prolific online diarist at his website, www.jtleroy.com, wrote reviews and interviews for various magazines and papers, wrote songs for a rock band, and at one point worked with Gus Van Sant on the movie *Elephant*.

28.     After *Sarah* and *The Heart is Deceitful Above All Things* were published, J. T.'s  reputation and celebrity grew.  His personal history and the stamp of authenticity it leant *Sarah* earned him literary praise.  He befriended famous writers, film directors,

movie stars and musicians.  Celebrities showed up to do readings from J. T.'s books for him.

29.    Despite his fame and notoriety, however, J. T. Leroy had a reputation of being reclusive, fragile and very shy.  He conducted whole relationships with people via facsimile, email and by telephone.  On the rare occasions J. T. appeared in public, it was always behind large, dark sunglasses and a feminine wig, and in the company of his keeper, "Speedie."

30.    J. T. Leroy's keeper "Speedie," was Laura Albert, his alleged housemate who, along with her long-time companion, Geoffrey Knoop, purportedly took J. T. Leroy off of the streets and set up house with him as a member of their family.  According to press accounts, in public Laura was very protective of J. T. and ran interference between J. T. on the one hand, and fans, hair and make-up artists, photographers and press on the other.

## SWALLOWED WHOLE AND REELED IN:

## ANTIDOTE PURCHASES AN OPTION TO DEVELOP *SARAH*

31.    The authenticity of *Sarah*'s narrative, created by J. T.'s highly publicized history, which was so important to J. T. Leroy's fans and celebrity cheerleaders, also directly influenced Antidote principal Jeff Levy-Hinte's vision for developing a film based on the story.

32.    *Sarah* came to Levy-Hinte's attention when director Steven Shainberg had his agent, Christian Bazdekis, give Levy-Hinte a copy of the book.  Shainberg had

previously approached Levy-Hinte to gauge Antidote's interest in developing and producing a project related to *Sarah* for Shainberg to direct.

33.     After reading the book and learning about J. T. Leroy's biography and rising celebrity, Levy-Hinte agreed to take on the *Sarah* film project.  For Antidote, what made *Sarah* interesting and compelling was precisely the knowledge that the novel was an aesthetic response to a horrific, real-life set of experiences.  Levy-Hinte believed that J. T. Leroy had managed to use art to understand, interpret and master a personal history of neglect, abuse and violence.  The alleged truth behind the novel created greater sympathy for the novel's narrative character, Cherry Vanilla, who was supposedly based on Leroy himself.  Additionally, the knowledge that J. T. Leroy had suffered through so much, was self-educated, began writing the novel while living as a hustler on the streets of San Francisco, and had lived through such a horrific childhood allowed Levy-Hinte to excuse—and even in some ways, celebrate—the more obvious shortcomings in the writing of the book.

34.     J. T. Leroy's story, then, was in large part the catalyst for Antidote agreeing to develop a project based on *Sarah*.

35.     Antidote negotiated with agents for Underdogs and J. T. Leroy to purchase a one-year option on the film rights to *Sarah* for $15,000.  That contract, attached to this Complaint as Exhibit A, was later extended for two additional year-long option periods, at an additional cost of $15,000 per year.  During the option period, Antidote invested significant time and resources exceeding $60,000 into developing the project, over and above the $45,000 spent on the option, including hiring a screenwriter to draft an initial

script, attend and participate in development meetings with the screenwriter, Jeffrey Hatcher, and Shainberg.   Defendants Underdogs, Albert, Leroy, and Farkas provided Antidote with a false IRS Form W-9 purportedly signed by J. T. Leroy on August 1, 2003, a copy of which is attached as Exhibit B.

THE CATCH:

WOULD THE REAL J. T. LEROY PLEASE STAND UP?

36.    In mid-to-late Fall, 2005, while Antidote was strategizing with Jeffrey Hatcher and Steven Shainberg on how to rework the first draft of the script for Antidote's *Sarah* film project, journalist Stephen Beachy published a New York Magazine article, a copy of which is attached as Exhibit C, claiming that J. T. Leroy did not exist, and that *Sarah* and Leroy's other works had actually been penned by Laura Albert.

37.    After publication of the Beachy article, additional journalists tried their hand at "outing" J. T. Leroy as a fraud and a hoax.   In February 2006, The New York Times published an interview, a copy of which is attached as Exhibit D, with Geoffrey Knoop, Defendant Albert's long-time companion, in which he claimed that Albert had invented J. T. Leroy and was in fact the actual author of all of Leroy's books.   It had been Albert who interviewed celebrities and was interviewed by media and press on the telephone and via email, Albert who made friends-by-fax with various famous writers and other celebrities over the years, and Albert who orchestrated faked publicity appearances and readings.   When J. T. Leroy was required to appear in person, Knoop's half-sister Savannah, an aspiring fashion designer, dressed up in dark glasses and long

wigs to both hide the hoax and add to the allure and mystery surrounding the exclusive writer.

38.    Defendant Underdogs, Inc., the Nevada corporation that received the proceeds from "J. T. Leroy's" writing and other professional activities, was traced to Laura Albert through its president and secretary, Carolyn Albert, who is Laura's mother.

39.    Upon publication of the Beachy article, Antidote set aside working on the new draft of the *Sarah* script until Beachy's claims were either verified or vilified. Antidote began a dialogue with J. T. Leroy's manager, Judi Farkas, who at first categorically denied the allegations in the Beachy article and, as late as February 17, 2006 was still representing that J. T. Leroy as real.  Exhibit E.

40.    At that time, Antidote hired counsel to ascertain the validity of Defendants Underdogs and J. T. Leroy's chain of title, which was crucial to the project going forward.

41.    Eventually, in the weeks after the Beachy article went to press, as more reporting from varied and independent sources further substantiated Beachy's claims, Antidote came to believe that Albert had been behind the J. T. Leroy persona and was the real author of *Sarah*.

42.    Antidote's belief that "J. T. Leroy" was actually Laura Albert was confirmed when Leroy's representatives provided it (inadequate and incomplete) chain-of-title documents that listed Laura Albert as the author of *Sarah*.

43.    Antidote found itself with a seemingly worthless film project on its hands, partly developed, and an option that was losing value rapidly.  It was no longer possible

to make the film Antidote had planned.  The book and its author had been thoroughly discredited; the publisher's continuing claims that the novel and other "J. T. Leroy" works were "semi-autobiographical" were patently false.

44.     Antidote could not make a movie based only on the novel *Sarah*, without regard to the biographical information of the author.  Much of the value Antidote saw in the project was related to the veracity and authenticity provided by the "author's" sordid and troubled past.

45.     Additionally, director Steven Shainberg has no interest in making a film based only on *Sarah* now that J. T. Leroy has been proven non-existent.  Antidote's involvement was always predicated on Shainberg's involvement, and Antidote has little to no interest in moving forward without Shainberg.

46.     Antidote's Levy-Hinte has also lost interest in developing a film project based solely on the novel.  Levy-Hinte's aesthetic view of the novel was always strongly flavored by "J. T. Leroy's" back-story.

47.     Defendants' fraud have made it virtually unthinkable that a distributor or a financier would ever invest any significant money into backing a project based solely on *Sarah*.  The book is discredited and a joke in the eyes of many, and many former dedicated fans and supporters of "J. T. Leroy," hurt and betrayed by Albert's fraud, are now vehement public critics of Albert and all of her writing.  Antidote believes that if it attempted to make a film based on a straight adaptation of the book as written it would damage Antidote's and Levy-Hinte's reputations as quality film-makers.

48.     Defendants' marketing and publicity for *Sarah*, as well as all other works by J. T. Leroy, was always predicated on the connection between Leroy, his experiences, and the literary works.  That connection was what gave *Sarah* the vast majority of its value; that value, however, is now a liability that cannot be ignored.

49.     Projects in the works by other filmmakers and by Albert herself—including a planned movie based on the hoax itself, and the rumor that Albert is working on her "real" memoirs—would only further publicize the hoax and fraudulent nature of J. T. Leroy's "semi-autobiographical" novels.  This is further reason that Antidote can no longer make the film it intended and invested in.

50.     Defendants, despite the fact that their fraud has been irrevocably exposed, continue to publish and rely upon the lie that is the J. T. Leroy persona, along with the claim that J. T. Leroy wrote *Sarah*.

51.     Laura Albert has continued to operate the www.jtleroy.com website as "J. T. Leroy," and continues to write and publish under the J. T. Leroy persona.

52.     Bloomsbury continues to publicize and advertise the fraudulent misrepresentation that J. T. Leroy wrote the novels *Sarah* and *The Heart is Deceitful Above All Things*, and that these novels are semi-autobiographical.  The books continue to be published as authored by J. T. Leroy, with the false biographic information printed on the cover.  A copy of the back cover of Sarah is attached as Exhibit F.  Bloomsbury's insistence on continuing to capitalize on the false designation of origin and false advertising associated with the "J. T. Leroy" fraud continues to cause confusion and would definitely impact any film Antidote could make based on *Sarah*.

## COUNT I

## <u>FALSE DESIGNATION OF ORIGIN</u>

(Violation of Lanham Act §43(a)(1)(A), 15 U.S.C. 1125(a)(1)(A))

(Against Defendants Bloomsbury, Underdogs, Albert, Farkas, and "J. T. Leroy")

53.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-52, which are incorporated herein by reference.

54.     Defendants, each individually and in concert, have represented, advertised and publicized the claim that a person known as "J. T. Leroy" wrote the novel *Sarah*;

55.     Defendants, each individually and in concert, have advertised and publicized the claim that the novel *Sarah* is semi-autobiographical and is based at least in part on the real-life experiences of J. T. Leroy.

56.     Upon information and belief, Plaintiff alleges that J. T. Leroy does not exist.

57.     Upon information and belief, Plaintiff alleges that the novel *Sarah* was written by Defendant Laura Albert.

58.     Upon information and belief, Plaintiff alleges that the novel *Sarah* is not, in fact, a semi-autobiographical novel.

59.     Defendants nonetheless continue to represent, publicize and advertise the lie that *Sarah* was authored by J. T. Leroy and is semi-autobiographical.

60.     Defendants have made and continue to make the above-alleged misrepresentations regarding the origin of *Sarah* and other works advertised as having been authored by J. T. Leroy in commercial advertising, promotions, and other

commercial dealings in connection with the sale of goods, i.e., copies of the books themselves and the ancillary rights associated therewith.

61.     Defendants have made and continue to make the above-alleged misrepresentations regarding the origin of *Sarah* in interstate commerce, and sell copies of the book and other books claimed to have been authored by J. T. Leroy across the country and around the world.

62.     Defendants' past and continuing representations, advertising and publicity of and relating to the lie that the novel *Sarah* was authored by a person known as "J. T. Leroy" constitute a false designation of origin under §43(a)(1)(A) of the Lanham Act;

63.     Defendants' past and continuing representations, advertising and publicity of the lie that *Sarah* is a semi-autobiographical novel based on actual experiences and hardships suffered by the fictional persona known as "J. T. Leroy" constitute a false designation of origin under §43(a)(1)(A) of the Lanham Act;

64.     Defendants' past and continuing representations, advertising and publicity of and relating to the false personal history of the persona known as J. T. Leroy constitute a false designation of origin under §43(a)(1)(A) of the Lanham Act;

65.     Defendants, each individually and in concert, relied upon, and continue to rely upon, their misrepresentations regarding the persona known as J. T. Leroy and their other related lies as a method of fooling the public in order to sell more copies of the novel *Sarah*, and other novels and works by J. T. Leroy.

66.     Defendants' lies and misrepresentations about the origin of the novel *Sarah* are likely to cause confusion, mistake and/or deception as to the origin of the novel and the authenticity of the story;

67.     Plaintiff has been and is likely to be damaged by the Defendants' past and continuing misrepresentations.  Antidote is unable to develop a film based on the novel while Defendants continue to misrepresent its true nature and origin.  Defendants' continuing misrepresentation of *Sarah*'s authorship will confuse potential moviegoers as to the authenticity of any film project developed, and will negatively impact not only the eventual value of a film but also the likelihood that any filmmaker could obtain the financing or distribution necessary to make the film at all.  The value of Antidote's option to develop a film based on *Sarah* is thus diminished and the investments in development by Antidote to date are effectively lost.

## COUNT II:

## FALSE ADVERTISING

(Violation of Lanham Act §43(a)(1)(B), 15 U.S.C. 1125(a)(1)(B))

(Against Defendants Bloomsbury, Underdogs, Albert, Farkas, and "J. T. Leroy")

68.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-67, which are incorporated herein by reference.

69.     Defendants, each individually and in concert, have represented, advertised and publicized the claim that a person known as "J. T. Leroy" wrote the novel *Sarah*;

70.    Defendants, each individually and in concert, have advertised and publicized the claim that the novel *Sarah* is semi-autobiographical and is based at least in part on the real-life experiences of J. T. Leroy.

71.    Upon information and belief, Plaintiff alleges that J. T. Leroy does not exist.

72.    Upon information and belief, Plaintiff alleges that the novel *Sarah* was written by Defendant Laura Albert.

73.    Upon information and belief, Plaintiff alleges that the novel *Sarah* is not, in fact, a semi-autobiographical novel.

74.    Defendants nonetheless continue to represent, publicize and advertise the lie that *Sarah* was authored by J. T. Leroy and is semi-autobiographical.

75.    Defendants have made and continued to make these misrepresentations of fact regarding the novel *Sarah* and J. T. Leroy in commercial advertising and promotion in connection with the sale of goods, i.e., copies of books purportedly authored by J. T. Leroy and the ancillary rights associated therewith.

76.    Defendants' past and continuing false and misleading representations, advertising and publicity of and relating to the lies that (a) J. T. Leroy exists, and (b) the novel *Sarah* was authored by J. T. Leroy constitute false advertising under §43(a)(1)(B) of the Lanham Act.

77.    Defendants' past and continuing false and misleading representations, advertising and publicity of the lie that *Sarah* is a semi-autobiographical novel based on

actual experiences and hardships suffered by the fictional persona known as "J. T. Leroy" constitute false advertising under §43(a)(1)(B) of the Lanham Act.

78.   Defendants' past and continuing representations, advertising and publicity of and relating to the false personal history of the persona known as J. T. Leroy constitute false advertising under §43(a)(1)(B) of the Lanham Act.

79.   Defendants, each individually and in concert, relied upon, and continue to rely upon, their misrepresentations regarding the persona known as J. T. Leroy and their other related lies as a method of fooling the public in order to sell more copies of the novel *Sarah*, and other works by J. T. Leroy.

80.   Defendants' claims about the "semi-autobiographical" novel *Sarah* and its purported author misrepresent the nature and quality of defendants' goods and commercial activities.

81.   Defendants' continuing claims about the "semi-autobiographical" novel *Sarah* and its purported author will constitute misrepresentations about the nature and quality of any film project developed by Plaintiff pursuant to its option contract.

82.   Plaintiff has been and is likely to be damaged by the Defendants' past and continuing misrepresentations.  Antidote is unable to develop a film based on the novel while Defendants continue to misrepresent the story's true nature and origin.  Defendants' continuing misrepresentation of *Sarah*'s authorship will confuse potential moviegoers as to the authenticity of any film project developed, and will impact not only the value of a film but the likelihood that any filmmaker could obtain the financing or distribution

necessary to make such a film. The value of Antidote's option on *Sarah* is thus diminished and the investments in development by Antidote to date are effectively lost.

## COUNT III:

## <u>FRAUD</u>

(Against Defendants Bloomsbury, Underdogs, Albert, Farkas, and "J. T. Leroy")

83.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-82, which are incorporated herein by reference.

84.    Defendants, each individually and in concert, falsely and publicly claimed that "J. T. Leroy" wrote the novel *Sarah* and other works, and falsely and publicly claimed that *Sarah* was semi-autobiographical in nature.

85.    Defendants, each individually and in concert, continue to falsely and publicly claim to be the author of *Sarah*, and continue to falsely and publicly claim that *Sarah* is semi-autobiographical in nature.

86.    Upon information and belief, Plaintiff alleges that the above-alleged representations were false.

87.    Upon information and belief, Plaintiff alleges that "J. T. Leroy" does not exist.

88.    Upon information and belief, Plaintiff alleges that the novel *Sarah* is fictional and is not "semi-autobiographical" in nature.

89.    Upon information and belief, Plaintiff alleges that Defendant Laura Albert is the true author of the novel *Sarah*.

90.     The unknown person using the assumed name "J. T. Leroy" deliberately and knowingly used the above-alleged false representations to induce consumers to purchase books, to increase fame and notoriety, and to induce Plaintiff Antidote to enter into an option contract to develop a film based on the novel *Sarah*.  "J. T. Leroy" made the misrepresentation regarding his identity and the nature of the novel *Sarah* deliberately and with the intent to deceive.

91.     Defendant Underdogs, Inc. deliberately and knowingly used the above-alleged false representations to induce consumers to purchase books, to increase fame and notoriety, and to induce Plaintiff Antidote to enter into an option contract to develop a film based on the novel *Sarah*.  Underdogs Inc. made the misrepresentation regarding J. T. Leroy's identity and the nature of the novel *Sarah* deliberately and with the intent to deceive.

92.     Defendant Laura Albert deliberately and knowingly used the above-alleged false representations to induce consumers to purchase books, to increase fame and notoriety, and to induce Plaintiff Antidote to enter into an option contract to develop a film based on the novel *Sarah*.  Laura Albert made the misrepresentation regarding J. T. Leroy's identity and the nature of the novel *Sarah* deliberately and with the intent to deceive.

93.     Defendant Bloomsbury deliberately and knowingly used the above-alleged false representations to induce consumers to purchase books, to increase fame and notoriety, and to induce others to purchase ancillary rights associated with the novel

*Sarah*.  Bloomsbury made the misrepresentation regarding J. T. Leroy's identity and the nature of the novel *Sarah* deliberately and with the intent to deceive.

94.     In the alternative, Defendant Bloomsbury used the above-alleged false representations to induce consumers to purchase books, to increase fame and notoriety, and to induce others to purchase ancillary rights associated with the novel *Sarah* with reckless disregard for the truth of the representations.

95.     "J. T. Leroy's" former editor at Bloomsbury, Karen Rinaldi, made statements published in an interview in Vanity Fair that illustrate that Bloomsbury either knew that "J. T. Leroy" was a fraud, or acted with reckless disregard as to the truth of J. T. Leroy's existence and the identity of *Sarah*'s author.  An article published in Vanity Fair.com in May 2006, a copy of which is attached as Exhibit G, described Rinaldi's last meeting with "J. T. Leroy" as follows:

> Karen Rinaldi hasn't spoken to J. T., or Jeremy, as she calls him, in a few years. She claims she always kept the writer at an emotional distance, but her kiss-off is as resonant as any: "I said, 'Jeremy, I don't know who you are. I don't know what part of your story is true. I don't think you're H.I.V.-positive. I think you're full of shit. But here's what I know: you're a brilliant writer. You're really good, and that's what I care about. The rest of it doesn't really mean that much to me.'" J. T.'s response? "He just giggled, and that was the last conversation I had with him."

96.     Defendant Bloomsbury deliberately and knowingly falsified its application for copyright for the novel *Sarah* (attached hereto as Exhibit H), by both failing to identify Laura Albert as the true author and by failing to note that "J. T. Leroy" was a pseudonym.

97.    In the alternative, Defendant Bloomsbury falsified its application for copyright for the novel *Sarah*, by both failing to identify Laura Albert as the true author and by failing to note that "J. T. Leroy" was a pseudonym, with reckless disregard for the truth of the matters asserted.

98.    Defendant Bloomsbury should have and could have known or discovered the truth regarding J. T. Leroy's existence and the true author of the novel *Sarah*.

99.    Defendant Bloomsbury should have and could have discovered the complete and factual information necessary to correctly and honestly file the application for copyright.

100.    Defendant Bloomsbury, in deliberately publicizing and advertising (a) that *Sarah* was written by "J. T. Leroy" and was semi-autobiographical in nature; and (b) "J. T. Leroy's" false personal history, pretended to knowledge it did not have and could not verify.

101.    Antidote was deceived by Defendants' misrepresentations regarding *Sarah*'s authorship and purported "semi-autobiographical" nature.

102.    Antidote was deceived by Defendants' misrepresentations regarding "J. T. Leroy's" biographical information and identity.

103.    Antidote justifiably relied upon the many and varied representations, including without limitation those in publicity, advertisements, and other commercial statements, regarding *Sarah*'s authorship and semi-autobiographical nature, along with J. T. Leroy's personal history, notoriety, and identity, in determining to enter into an option contract to develop a film based on *Sarah*.

104.    The false representations regarding *Sarah*'s authorship and J. T. Leroy's background were material to Antidote in its decision to option *Sarah* and to begin development of a film based on what Antidote believed was "J. T. Leroy's" semi-autobiographical novel.

105.    As a result of Defendants' deliberate and knowing misrepresentations, Antidote was induced to enter into an option contract and begin development of a film project based on *Sarah*.   Antidote would not have invested the resources it did in acquiring the option and developing a project had Defendants disclosed that *Sarah* was not semi-autobiographical and J. T. Leroy did not exist.

106.    As the direct and proximate result of Defendants' wrongful and fraudulent conduct, Antidote has been injured.   The option and the project are decreased in value, the director is no longer interested, financial backing and distribution are unlikely at best, and the investments to-date have been lost.

## COUNT IV:

## <u>NEGLIGENT MISREPRESENTATION</u>

(In the alternative, against Defendants Underdogs, Farkas, and Bloomsbury)

107.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-106, which are incorporated herein by reference.

108.    Defendants Farkas and Underdogs should have known and had the ability to discover that "J. T. Leroy" was a fraudulent pseudonym.

109.   Defendant Underdogs, by virtue of its contractual relationship and negotiations with Antidote for the option contract, knew that Antidote was relying on the information about *Sarah*'s author and his personal history, and knew that those misrepresented facts were material in Antidote's consideration of whether or not *Sarah* was suitable material for development.

110.   Defendants Underdogs and Farkas made representations regarding *Sarah*'s authorship, ownership and chain of title to Antidote that were false when made.

111.   Based on their special relationship with and access to "J. T. Leroy," Underdogs and Farkas had a duty to ascertain and provide accurate information to Antidote, and Antidote had the right to rely upon the information provided.

112.   Because of its reliance on Underdogs and Farkas negligently provided information regarding *Sarah*'s authorship, ownership and chain of title, Antidote has suffered damage.  It was fraudulently induced to enter a contract it would not have otherwise entered; it has invested monetary and other resources in developing a project that is no longer viable; the value of its option has been drastically reduced.  These harms are the direct and proximate result of Underdogs' negligent misrepresentations and fraud.

113.   Defendant Bloomsbury should have known and had the ability to discover that "J. T. Leroy" was a fraudulent pseudonym.

114.   Defendant Bloomsbury, by virtue of its standing as a major publishing house that does business around the world, knew or should have known that film producers such as Antidote and other potential purchasers of ancillary rights associated

with the novel *Sarah* would rely on information Bloomsbury provided in press releases, advertising and other publicity about the book, its author, and his background.

115.   Defendant Bloomsbury, by virtue of its standing as a major publishing house that does business around the world, knew or should have known that film producers such as Antidote and other potential purchasers of ancillary rights associated with *Sarah* would rely on Bloomsbury's statements in the application for copyright submitted by Bloomsbury on the author's behalf.

116.   Based on Bloomsbury's special relationship with and access to "J. T. Leroy," it had the duty and ability to ascertain the truth of its representations regarding *Sarah*'s purported author and his personal history.

117.   Based on Bloomsbury's filing of an application under Federal law for copyright on "J. T. Leroy's" behalf, it represented that it was an authorized agent and had a duty to ascertain the truth of its representations regarding *Sarah*'s author and the failure to identify "J. T. Leroy" as a pseudonym.

118.   Because of its reliance on Bloomsbury's negligently provided information regarding *Sarah*'s authorship in press releases, publicity, advertising, and the application for copyright, Antidote has suffered damage.  Antidote was fraudulently induced to enter a contract it would not have otherwise entered; it has invested monetary and other resources in developing a project that is no longer viable; the value of its option has been drastically reduced.  These harms are the direct and proximate result of Defendant Bloomsbury's negligent misrepresentations and fraud.

## COUNT V:

## **BREACH OF CONTRACT**

(Against Defendants Underdogs, "J. T. Leroy" and Albert)

119.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-118, which are incorporated herein by reference.

120.   As already described above, Plaintiff entered into a express, written option contract for film rights to *Sarah* with Defendants Underdogs and "J. T. Leroy." (Exhibit A). The original contract was for a one-year term. Pursuant to the terms of the contract and upon payment of consideration by Plaintiff, Plaintiff extended that option for two additional years. Plaintiff paid $15,000 per year for the option to develop *Sarah* into a viable film project.

121.   Defendants Underdogs and "J. T. Leroy" represented to Antidote, in negotiations and in the contract itself, that Underdogs was the proper entity to enter into contract for ancillary rights related to the novel *Sarah*, that "J. T. Leroy" was the author of the novel *Sarah*, and that the novel was semi-autobiographical.

122.   As already described above, upon information and belief, and based on information provided by Defendants Underdogs and "J. T. Leroy" to Antidote, Plaintiff believes that Laura Albert is both the owner of Underdogs, Inc. and the alter-ego of "J. T. Leroy."

123. As already described above, and upon information and belief, Plaintiff alleges that Laura Albert signed the express, written contract between Underdogs, Inc. and Plaintiff Antidote as "J. T. Leroy."

124. Section 9 of the express, written option contract between Underdogs, Inc., "J. T. Leroy" and Plaintiff Antidote, "Representations and Warranties," contains a false representation and warranty as to the author and ownership of the novel *Sarah*. See Exhibit A, at §9(a), p. 7.

125. Section 9(a) of the option contract reads as follows:  "JT Leroy is the sole author of the Work and Owner is the sole and exclusive owner and proprietor throughout the universe of the Work and any and all Granted Rights granted to the producer herein." Exhibit A, at §9(a), p. 7.

126. Defendants Underdogs and "J. T. Leroy," along with Defendant Laura Albert (as J. T. Leroy's alter-ego) knew that the representation and warranty set forth in §9(a) of the option contract was false when the contract was drafted and executed.

127. Defendants' false representation in §9(a) of the option contract constitutes a material breach of that agreement.

128. Section 8 of the option contract, "Use of Owner's Likeness and Biographical Material," provides in pertinent part that Antidote, upon exercising its option under the agreement, "shall have the unlimited and perpetual right to utilize Owner's name, approved likeness and approved biography in connection with the work and any productions or other products based upon the Work and advertising and publicity relating thereto."

129.    Defendants Underdogs, "J. T. Leroy" and Laura Albert's breach of the contract and misrepresentations regarding the author of *Sarah* and his biography have rendered Section 8 of the option contract meaningless and constitutes an additional breach of the agreement.

130.    Alternatively, Defendants Underdogs, "J. T. Leroy" and Laura Albert's breach of the contract and misrepresentations regarding the author of *Sarah* and his biography entitle Antidote to, upon exercise of its option, exercise the "unlimited and perpetual right to utilize" Laura Albert's name, likeness and biography in and in connection with any film project developed by Antidote.

131.    Section 1(a) of the option contract provides that any option period shall be extended "in the event of Owner's material breach" of the option contract.  Defendants Underdogs, "J. T. Leroy" and Laura Albert were in material breach of the option contract from the time it was executed and continuously for each option period.  Antidote is thus entitled, under the express terms of §1(a) of the contract, to three (3) one-year extensions of the option contract related to *Sarah*.

132.    Section 1(a) of the option contract also provides that Antidote "shall provide written notice to Owner of all option period extensions under this paragraph."

133.    As already described above, Plaintiff provided notice to Underdogs in Exhibit I, on July 17, 2006, that Underdogs, "J. T. Leroy" and Laura Albert's material breach of the contract required extension of the option.

134.    Underdogs responded on July 18, 2006 that no extension under §1(a) of the contract would be honored.  See Exhibit J.

135.   Underdogs, "J. T. Leroy" and Laura Albert's refusal to honor the option extension based on their material breach of the contract is in itself a breach of the contract, which has caused Antidote to suffer damages that include, without limitation, the necessity of filing suit to secure its rights.

136.   Section 13 of the option contract, "Additional Documents" provides that "[a]t Producer's request, Owner will at no additional cost of expense to Producer, execute and deliver such further documents and perform such further acts consistent herewith as may be or become reasonably necessary or desirable to effectuate the purposes of this Agreement."  Exhibit A, p.8, at §13.

137.   When Defendant Albert's fraud regarding the J. T. Leroy persona was revealed, Plaintiff requested that Defendants provide further documentation to establish a proper chain of title to the film rights to *Sarah*.   Although Defendants eventually provided documentation that traced the title back and demonstrated that Albert was the actual author of *Sarah*, those documents were incomplete and insufficient to establish a proper chain of title to the rights necessary for development of the project to continue.

138.   This failure to establish title and to provide the necessary documentation constitutes a further breach of the option contract and has caused Antidote additional damages related to the value of the option and any anticipated film project in development.

## COUNT VI:

## <u>REFORMATION</u>

(Against Defendants Underdogs and Albert)

139.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-138, which are incorporated herein by reference.

140.   As already described above, Plaintiff entered into a express, written option contract with Defendants Underdogs and "J. T. Leroy."   (Exhibit A).   The original contract was for a one-year term.   Pursuant to the terms of the contract and upon payment of consideration by Plaintiff, Plaintiff extended that option for two additional years. Plaintiff paid $15,000 per year for the option to develop *Sarah* into a viable film project.

141.   As already described above, Defendants Underdogs and "J. T. Leroy" represented to Antidote in negotiations and in the contract itself that Underdogs was the proper entity to enter into contract for ancillary rights related to the novel *Sarah*, that "J. T. Leroy" was the author of the novel *Sarah*, and that the novel was semi-autobiographical.

142.   As already described above, upon information and belief, and based in part on information provided by Defendants Underdogs and "J. T. Leroy," Plaintiff believes that Laura Albert is both the owner of Underdogs, Inc. and the alter-ego of "J. T. Leroy."

143.   As already described above, and upon information and belief, Plaintiff alleges that Laura Albert signed the express, written contract between Underdogs, Inc. and Plaintiff Antidote as "J. T. Leroy."

144.    Section 9 of the express, written option contract between Underdogs, Inc., "J. T. Leroy" and Plaintiff Antidote, "Representations and Warranties," contains a representation and warranty as to the author and ownership of the novel *Sarah*.  See Exhibit A, at §9(a), p. 7.

145.    As already described above, Defendants Underdogs, "J. T. Leroy" and Laura Albert operated a fraud upon Plaintiff Antidote regarding *Sarah*'s author and his biographical information.  These defendants, each individually and collectively, made false representations in the express contract and the negotiations therefore, and in their press releases, publicity, advertisements and other commercial speech related to *Sarah* and "J. T. Leroy."  By their fraud, Defendants falsely induced Antidote to enter into a contract that has now been rendered, in its terms, meaningless as drafted.

146.    Section 8 of the option contract, "Use of Owner's Likeness and Biographical Material," provides in pertinent part that Antidote, upon exercising its option under the agreement, "shall have the unlimited and perpetual right to utilize Owner's name, approved likeness and approved biography in connection with the work and any productions or other products based upon the Work and advertising and publicity relating thereto."

147.    Defendants Underdogs, "J. T. Leroy" and Laura Albert thus, by their fraudulent inducement, caused Antidote to purchase rights that do not exist and/or are, in their true nature, other than Antidote believed at the time the contract was executed.

148.    Defendants Underdogs, "J. T. Leroy" and Laura Albert's breach of the contract and misrepresentations regarding the author of *Sarah* and his biography, along

with their fraudulent representations and false inducements, entitle Antidote to, upon exercise of its option, reform the contract and exercise the "unlimited and perpetual right to utilize" Laura Albert's name, likeness and biography in and in connection with any film project developed by Antidote.

149.   In the alternative, Defendant "Underdogs," through its negligence and reckless disregard for the truth, entered into a contract with Antidote that included express rights, the nature of which was the subject of mutual mistake on the part of both parties.

150.   The mutual mistake alleged above, regarding the identity of *Sarah*'s author and his biography, was material and effectually nullifies several provisions of the option contract.

151.   As such, in order to effectuate the true intention of the parties in executing the contract, Antidote should be permitted by equity and law to, upon exercise of its option, reform the contract and exercise the "unlimited and perpetual right to utilize" Laura Albert's name, likeness and biography in and in connection with any film project based on *Sarah* that Antidote develops.

## COUNT VII:

## <u>RESCISSION</u>

(Against Defendants Underdogs and Albert)

152.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-151, which are incorporated herein by reference.

36

153.    As already described above, Plaintiff entered into a express, written option contract with Defendants Underdogs and "J. T. Leroy."   (Exhibit A).   The original contract was for a one-year term.   Pursuant to the terms of the contract and upon payment of consideration by Plaintiff, Plaintiff extended that option for two additional years. Plaintiff paid $15,000 per year for the option to develop *Sarah* into a viable film project.

154.    As already described above, Defendants Underdogs and "J. T. Leroy" represented to Antidote, in negotiations and in the contract itself, that Underdogs was the proper entity to enter into contract for ancillary rights related to the novel *Sarah*, that "J. T. Leroy" was the author of the novel *Sarah*, and that the novel was semi-autobiographical.

155.    As already described above, upon information and belief, and based upon information provided to Antidote by Defendants Underdogs and "J. T. Leroy," Plaintiff believes that Laura Albert is both the owner of Underdogs, Inc. and the alter-ego of "J. T. Leroy."

156.    As already described above, and upon information and belief, Plaintiff alleges that Laura Albert signed the express, written contract between Underdogs, Inc. and Plaintiff Antidote as "J. T. Leroy."

157.    Section 9 of the express, written option contract between Underdogs, Inc., "J. T. Leroy" and Plaintiff Antidote, "Representations and Warranties," contains a representation and warranty as to the author and ownership of the novel *Sarah*.   See Exhibit A, at §9(a), p. 7.

158.   As already described above, Defendants Underdogs, "J. T. Leroy" and Laura Albert operated a fraud upon Plaintiff Antidote regarding *Sarah*'s author and his biographical information.  These defendants, each individually and collectively, made false representations in the express contract and the negotiations therefore, and in their press releases, publicity, advertisements and other commercial speech related to *Sarah* and "J. T. Leroy."  By their fraud, Defendants falsely induced Antidote to enter into a contract that has now been rendered, in its terms, meaningless as drafted.

159.   As such, Antidote is permitted by law and equity to rescind the contract in its entirety, recover all sums paid to Defendants thereunder, and recover for all resources, monetary and otherwise, invested in attempted development of a film project based on *Sarah* during the period of the option.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following judgments with respect to this Complaint:

1.   An order temporarily and preliminarily enjoining Defendants Underdogs, "J. T. Leroy," and/or Laura Albert from selling any option to purchase film rights to *Sarah*, or any other ancillary rights included in the option contract at Exhibit A, to any third-party during the pendancy of this litigation;

2.   An order permanently enjoining Defendants Underdogs, "J. T. Leroy," and/or Laura Albert from selling any option to purchase film rights to *Sarah*, or any other ancillary rights included in the option contract at Exhibit A, to any third-party;

3.     An order compelling Underdogs, "J. T. Leroy," and/or Laura Albert to provide Antidote with specific performance of their duties owed under Section 1(c) of the option contract at Exhibit A, along with a declaration that, based on Defendants' breach of contract, Antidote's option to develop a film based on *Sarah* is extended by three (3) years;

4.     An order temporarily, preliminarily and permanently enjoining Defendants, individually and/or in concert, from continuing to publish, represent, assert or advertise the false statements that (a) "J. T. Leroy" exists; (b) "J. T. Leroy" is the author of the novel *Sarah* published by Bloomsbury in April 2000; (c) *Sarah* is a semi-autobiographical novel; or (d) "J. T. Leroy's" other novels and stories are semi-autobiographical in nature;

5.     An order temporarily, preliminarily and permanently requiring Defendant Bloomsbury to engage in immediate corrective advertising noting that "J. T. Leroy" is a pseudonym, no such individual exists, and that the novel *Sarah* is not "semi-autobiographical" in nature;

6.     An order from this Court temporarily, preliminarily and permanently enjoining Defendants from further unfair competition and false advertising;

7.     An order from this Court reforming the contract between Antidote and Underdogs to grant Antidote (a) a three-year extension as described in ¶3 of this section, above; and (b) publicity rights to use Laura Albert's name, likeness and biographical information in and in association with any film developed by Antidote based on *Sarah*, as

replacement for the similar rights granted with respect to "J. T. Leroy" in §8 of the contract;

8.      An award of compensatory damages for the competitive and other economic injury that Plaintiff has suffered and will suffer as a direct and proximate result of Defendants' unlawful and anticompetitive false advertising and false designation of origin in an amount not yet known;

9.      An award of compensatory damages for the economic injuries Plaintiff has suffered and will suffer as a direct and proximate result of Defendants' fraud and/or negligent misrepresentation;

10.      An award of compensatory damages for the economic injuries Plaintiff has suffered and will suffer as a direct and proximate result of Defendants' breaches of contract;

11.      Antidote's actual and reasonable attorneys' fees as authorized by the contract and law.

12.      Such other relief as the Court in its judgment deems necessary to restore competition to the industry and /or in the interests of justice.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.L.C

By: _____
        Gregory L. Curtner (GC 5395)
        Susan I. Robbins (SR 5759)
        Kimberly K. Kefalas
        Attorneys for Plaintiffs
        1450 Broadway, 41st Floor
        New York, NY 10018
        Telephone: (212) 704-4400

August 10, 2006

AALIB:473194.1\124124-00002